**THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | 3:21-CR-126 |
| | : | (JUDGE MARIANI) |
| MICHAEL JONES, JR., | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

### I.   INTRODUCTION AND PROCEDURAL HISTORY

On April 27, 2021, a federal grand jury indicted Defendant Michael Jones, Jr., in a

10-count Indictment, charging him as follows:

- Conspiracy to Distribute and Possess with Intent to Distribute Cocaine Base and Fentanyl in violation of 18 U.S.C. § 846 (Count 1);

- Possession with Intent to Distribute Cocaine Base in violation of 18 U.S.C. § 841(a)(1) (Counts 2, 4);

- Possession with Intent to Distribute Fentanyl in violation of 18 U.S.C. § 841(a)(1) (Counts 3, 5);

- Possession with Intent to Distribute Methamphetamine in violation of 18 U.S.C. § 841(a)(1) (Count 6);

- Possession of a Firearm in Furtherance of Drug Trafficking in violation of 18 U.S.C. § 924(c) (Count 7);

- Prohibited Person in Possession of a Firearm in violation of 18 U.S.C. § 922(g) (Count 8);

- Possession of a Stolen Firearm in violation of 18 U.S.C. § 922(j) (Count 9);

- Maintaining a Drug Involved Premises in violation of 21 U.S.C. § 856(a)(2) (Count 10).

(Doc. 1).[1]

On October 4, 2021, Defendant filed a Motion to Suppress Physical Evidence (Doc. 26).  Defendant's motion arises out of a traffic stop of Jones' vehicle in Luzerne County by the Pennsylvania State Police on March 14, 2021.  (Doc. 26).  Defendant argues that all evidence seized subsequent to the traffic stop, including drugs and related paraphernalia from the vehicle, and drugs, drug paraphernalia, and guns later seized from a residence in Wilkes-Barre, must be suppressed.  (Id.).

The Court held an evidentiary hearing on Defendant's suppression motion on April 5, 2022.  At the hearing, the Government presented the testimony of two law enforcement witnesses: Jeffrey Lamm and Mark Conrad.  At the request of Defendant, and with the Government's concurrence, the Court held a second evidentiary hearing to supplement the record on May 20, 2022.  At the second hearing, the Government presented further testimony by Jeffrey Lamm as well as testimony from Amanda Barton. Defendant did not present witness testimony at either hearing.

The parties have each filed post-hearing briefs (see Docs. 43, 53, 55), and Defendant's motion to suppress is ripe for resolution.  For the reasons set forth herein, the Court will deny the Motion to Suppress Physical Evidence (Doc. 26).

---

[1] Counts 1, 2, and 4 of the Indictment were amended on June 15, 2022, to reflect that the cocaine seized from Jones' vehicle and residence was cocaine, not cocaine base. (See Doc. 21).

2

## II. BACKGROUND

The testimony of Jeffrey Lamm, Mark Conrad, and Amanda Barton at the evidentiary hearing and/or supplemental hearing, in conjunction with the exhibits admitted at the hearings, provide the basis for the relevant factual background of Defendant's motion.

Jeffrey Lamm is a Pennsylvania State Police Trooper who has been assigned to the Troop P Vice Narcotics Unit for 20 years. (Test. of Lamm, Hr'g Tr., Apr. 5, 2022, at 5). Amanda Barton, Lamm's CI, began working with Lamm in 2019.  (Test. of Barton, Hr'g Tr., May 20, 2022, at 25, 36-37).

Barton first met Defendant Jones in 2020 when he was selling drugs out of the laundry room at the Wood Springs Suite Hotel where Barton was living.  (Test. of Barton, Hr'g Tr., May 20, 2022, at 27).  She purchased heroin from him on a daily basis and occasionally also purchased crack cocaine.  (Test. of Barton, Hr'g Tr., May 20, 2022, at 27-28, 38).  In February of 2021, Barton moved to the Wilkes-Barre Inn and Suites and met Stephanie Vickers and her husband Clinton Cole.  (Test. of Barton, Hr'g Tr., May 20, 2022, at 28-29).  Vickers was living in an adjacent hotel, the Host Inn, in Room 165, and was selling drugs.  Barton learned that Jones was Vickers' supplier when Vickers called Barton to come to her room one day to meet the supplier and to sell drugs to Barton.  (Test. of Barton, Hr'g Tr., May 20, 2022, at 29-30).

In February, 2021, upon discovering that Jones was Vickers' supplier, Barton called Lamm to inform him of her discovery.  (Test. of Barton, Hr'g Tr., May 20, 2022, at 30).

Lamm testified that his CI provided him with the following information:

> Michael Jones was a large-scale drug supplier/dealer from the Philadelphia area that was bringing large quantities of fentanyl, heroin and crack cocaine back and forth from. . . Philadelphia to Wilkes-Barre, and then bringing currency and what not back and forth, at least, three or four times a month and was making a large amount of money doing this.

(Test. of Lamm, Hr'g Tr., Apr. 5, 2022, at 8).  Lamm stated that he was told that Jones would supply other drug dealers in the area as well as deal drugs to people "in a hand-to-hand level".  (Test. of Lamm, Hr'g Tr., Apr. 5, 2022, at 8).[2]  Upon receiving this information, Trooper Lamm began an investigation into Jones, which included going through databases and finding out that Jones dealt with people at local hotels, including a woman named Stephanie Vickers who was staying in Room 165 of the Host Inn in Wilkes-Barre.  (Test. of Lamm, Hr'g Tr., Apr. 5, 2022, at 8-9, 25).

Barton became friends with Vickers and began providing Lamm with daily updates on Jones.  (Test. of Lamm, Hr'g Tr., Apr. 5, 2022, at 9).  Barton obtained the information about Jones through Vickers, unbeknownst to her.  (Test. of Lamm, Hr'g Tr., Apr. 5, 2022, at 9).  Lamm's understanding was that Jones was supplying Vickers with heroin, fentanyl, and "most likely" crack cocaine.  (Test. of Lamm, Hr'g Tr., Apr. 5, 2022, at 10).

---

[2] At the time Barton contacted Lamm in February of 2021, she was not facing any criminal charges and was working with him for money.  (Test. of Lamm, Hr'g Tr., Apr. 5, 2022, at 23; *see also*, Test. of Barton, Hr'g Tr., May 20, 2022, at 26).  Barton had been working for Lamm for "several years", had done "dozens of controlled purchases", "provided reliable information", and Trooper Lamm had "arrested and successfully prosecuted several defendants, based upon information and [Barton's] cooperation."  (Test. of Lamm, Hr'g Tr., Apr. 5, 2022, at 23; *see also*, Test. of Barton, Hr'g Tr., May 20, 2022, at 37 (testifying that she had worked with Lamm "less than twenty, more than two" times)).

On March 10, 2021, Lamm, with a law enforcement team, conducted a controlled purchase of fentanyl from Vickers through Barton. (Test. of Lamm, Hr'g Tr., Apr. 5, 2022, at 9; *see also*, Test. of Barton, Hr'g Tr., May 20, 2022, at 30). The controlled purchase was made in Room 165 of the Host Inn. (Test. of Lamm, Hr'g Tr., Apr. 5, 2022, at 11; Test. of Barton, Hr'g Tr., May 20, 2022, at 31). Barton testified that the controlled buy lasted about 5 minutes. While in the room, Vickers told her that Jones was "showing up" to bring more drugs and collect money. (Test. of Barton, Hr'g Tr., May 20, 2022, at 31-32; *see also*, Test. of Lamm, Hr'g Tr., Apr. 5, 2022, at 29, 42-43 (testifying that, although he did not see Jones on March 10, 2021, his CI told him that Jones was coming to the hotel to deliver drugs to Vickers)).

Lamm testified that he was located in the parking lot of the hotel during the controlled purchase.[3] Lamm met Vickers after the controlled purchase when he was with Barton and Vickers came up to his car and introduced herself. (Test. of Lamm, Hr'g Tr., Apr. 5, 2022, at 28; Test. of Barton, Hr'g Tr., May 20, 2022, at 33).

Law enforcement officers saw Jones pull up to the hotel on March 10, 2021. Jones left before the controlled purchase occurred and was followed from the hotel by some

---

[3] At the first hearing, Lamm testified that he could see Vickers' room from where he was located and further stated that he saw Barton go into Vickers' room and then saw them come out of the hotel room together after the controlled buy. (Test. of Lamm, Hr'g Tr., Apr. 5, 2022, at 27, 40). During the second hearing, Lamm admitted that he could not see Vickers' room from the parking lot but that Wilkes-Barre Police Officer Jeff Ference was on the inside of the courtyard where the room was visible. (Test. of Lamm, Hr'g Tr., May 20, 2022, at 8-9). Lamm clarified that other law enforcement officers, but not himself, saw Barton walk into Vickers' hotel room and provided him with "real-time updates" of their observations, including "where people are at and what they're doing." (Test. of Lamm, Hr'g Tr., May 20, 2022, at 15, 19).

members of the surveillance team, who followed him to two different addresses, including

one address to which Jones' vehicle was registered.  (Test. of Lamm, Hr'g Tr., Apr. 5, 2022,

at 12-13, 28).

On March 10, 2021, Barton also informed Lamm that, during the controlled buy with

Vickers, she had learned that Jones was planning on making a trip to Philadelphia "within

the next few days to re-up or obtain more narcotics."  (Test. of Lamm, Hr'g Tr., Apr. 5, 2022,

at 12).

On March 12, 2021, Barton informed Lamm that Jones was going to "leav[e] shortly

to go to Philadelphia to obtain heroin, fentanyl and crack cocaine", and would be leaving

with a man named Clinton Cole in Jones' vehicle.  (Test. of Lamm, Hr'g Tr., Apr. 5, 2022, at

13; Test. of Barton, Hr'g Tr., May 20, 2022, at 34).  Surveillance units were set up "at

several locations trying to find the vehicle" in order to "put eyes on it and to see who was

actually driving it and where they were going."  (Test. of Lamm, Hr'g Tr., Apr. 5, 2022, at

14). The surveillance units "picked them up" at the residence registered to Jones' vehicle,

were able to identify that Jones and Cole were in the vehicle, and "followed [Jones and

Cole] on to the Cross Valley Expressway onto 115 South and, ultimately, up to the

Pennsylvania Turnpike, where they committed to 476 southbound."  (Test. of Lamm, Hr'g

Tr., Apr. 5, 2022, at 14).

Lamm explained that Barton then provided him with the following information on

March 14, 2021:

Mr. Cole and Jones were going to be on their way back from Philadelphia to Wilkes-Barre with narcotics in the vehicle, and she said that past practice is she knew they had kept it in the trunk of the vehicle, the substances were in the trunk of the vehicle. Didn't know exactly where, just that that's, normally, where they put the drugs when they transport them.

(Test. of Lamm, Hr'g Tr., Apr. 5, 2022, at 15, 31; *see also*, Test. of Barton, Hr'g Tr., May 20, 2022, at 34 (Barton testifying that she contacted Lamm to tell him Jones and Cole were returning from Philadelphia with drugs which were located in the trunk of the vehicle)). Surveillance was thereafter "set up on several arteries, roadways, that lead into the Wilkes-Barre area and, ultimately, Mr. Cole and Mr. Jones were observed exiting the Pennsylvania Turnpike." (Test. of Lamm, Hr'g Tr., Apr. 5, 2022, at 15). Once Jones and Cole exited the Turnpike and were on Route 115, Lamm followed the vehicle "directly or one car behind them, but [] was in a very close proximity to them." (Test. of Lamm, Hr'g Tr., Apr. 5, 2022, at 16). Lamm noted that the vehicle was "definitely going faster than the posted speed limit" and was following another vehicle, a red SUV, "at a very close distance, less than a car length." (Test. of Lamm, Hr'g Tr., Apr. 5, 2022, at 17, 34). Lamm then radioed to Pennsylvania State Police Corporal Mark Conrad that he was following Jones' vehicle and that the vehicle was following another car at a very close distance. (Test. of Lamm, Hr'g Tr., Apr. 5, 2022, at 17, 34-35; Test. of Conrad, Hr'g Tr., Apr. 5, 2022, at 47).[4] Conrad then

---

[4] By this time, Conrad had been made aware that a vehicle would be traveling from Philadelphia and that a confidential informant had provided information that the individual in the car was "going to be supplying or bringing back from Philadelphia a quantity of controlled substances." (Test. of Conrad, Hr'g Tr., Apr. 5, 2022, at 46, 58).

7

observed the vehicle at issue and observed the traffic violation.  (Test. of Conrad, Hr'g Tr.,

Apr. 5, 2022, at 48).  Once Jones' vehicle "committed to Exit 1", which is approximately 100

yards from the Host Inn, Conrad stopped Jones' vehicle.  (Test. of Lamm, Hr'g Tr., Apr. 5,

2022, at 17; Test. of Conrad, Hr'g Tr., Apr. 5, 2022, at 48-49).

Upon stopping the vehicle, Conrad observed "that the driver was facing forward, and

once the vehicle came to a stop on the right shoulder, [Conrad] noticed the passenger

immediately turned himself back and focused his attention on [Conrad's] patrol vehicle,

[Conrad] exiting the vehicle and approaching the rear of his vehicle."  (Test. of Conrad, Hr'g

Tr., Apr. 5, 2022, at 49).  When Conrad made contact with the individuals in the vehicle, he

noticed "a strong odor of air freshener" and "noticed that the driver, who identified himself as

Mr. Cole, appeared nervous, was very talkative, was laughing when there was nothing

humorous said . . [and] noticed that the passenger identified as Mr. Jones seemed to be

very uncomfortable with me at his window, he appeared to be nervous."  (Test. of Conrad,

Hr'g Tr., Apr. 5, 2022, at 49-50).  Upon approaching the passenger side of the vehicle,

Conrad informed Cole and Jones that their vehicle was tailgating and that the driver, Cole,

needed to "watch [his] speed."  (Dash Camera Video, Hr'g Ex. G-8, at 1:14-1:17).[5]  When

Conrad requested Cole's driver's license, Cole stated he had no license with him and that

he had "forgot[ten]" his wallet.  (Dash Camera Video, Hr'g Ex. G-8, at 1:36-1:48).

---

[5] Conrad's patrol vehicle was equipped with dash cameras that capture audio and video which are
programmed to automatically activate and start capturing a file "a certain time period after the [police car]
lights are activated."  (Test. of Conrad, Hr'g Tr., Apr. 5, 2022, at 50, 60-61).

After briefly speaking with Cole and Jones while they were seated in their vehicle, Conrad asked Cole to get out of the car and come speak with him.  (Dash Camera Video, Hr'g Ex. G-8, at 2:15).  Conrad sat in his police car and directed Cole to speak with him through the police car's passenger side window.  Jones remained in his vehicle and was watched by another Trooper who had arrived on scene.  After approximately a minute of speaking with Conrad, Cole asked him "what's going on", to which Conrad explained that Cole had been tailgating and was driving without a license.  (Dash Camera Video, Hr'g Ex. G-8, at 3:32-3:38).  Conrad and Cole continued speaking for approximately four minutes.

Conrad testified that his conversation with Cole (*see generally* Dash Camera Video, Hr'g Ex. G-8), raised his suspicions that there was criminal activity for the following reasons:

> . . . [Cole] first indicates to me, when I ask who his passenger was, I believe, his words were, He's a good friend, but when I asked for the last name, he appeared to not know the last name, and I believe he said he thinks it's Jones, his friend. So I didn't think it was a good close friend, at that point, when he didn't know his last name.
>
> They're coming from a source location in Philly, which was information verified from the Vice Unit. I was informed by the Vice Unit that they know that they took the trip on Friday, he's telling me they went Thursday, so he's not being truthful about their travel itinerary.
>
> When asking details about travel plans, he's just providing vague answers, he's trying to often pivot from my questioning, when he's asking me, Do I want a cheese steak, and, What's going on, he doesn't want to engage me in answering any of my questions, so they're, sort of, deterrent moves that he's making.
>
> He's telling me that he went there and just stayed in a hotel room, yet, he has no luggage for, you know, a several-day trip that he's telling me, not even a toothbrush. So based on just the conversation with him alone and the

information that Vice provided, I believe, that he was engaged in a trip for a criminal purpose.

(Test. of Conrad, Hr'g Tr., Apr. 5, 2022, at 51-52).

Following Conrad's conversation with Cole, Jones then came to speak with Conrad

through the passenger window of Conrad's police vehicle. (Dash Camera Video, Hr'g Ex.

G-8, at 7:40). Subsequent to the conversation with Jones, Conrad testified that he continued

to believe Jones and Cole were engaged in criminal activity.

> Well, again, [Jones] verified that they're coming from Philadelphia, a source location, that was corroborated with the information I received from Vice. He had a conflicting time from the driver when they went. He indicated they went yesterday, not Thursday, which yesterday would have been Saturday at that time.
>
> When asked times when they met up, he questioned the driver, What did he tell him, What time did he tell him we met up? So I saw that as he wanted to verify times, make sure he wasn't providing conflicting stories. He had to find out what time he told me.
>
> Later in the conversation, when I asked about Mr. Cole not having clothes, he tells me, Well, they were only there for two days, which he contradicted himself by telling me yesterday, not two days.
>
> And when I asked if he has anything illegal in the vehicle, I noticed that he broke eye contact with me, looked at the vehicle, said, No. I often see that, when people turn their attention, when it gets into a contentious encounter like this, to search the vehicle, they often stare at the vehicle. So I picked up on that.
>
> Based upon their reaction, conflicting stories, the vague travel plans, the totality of the information they were providing, I believed that they were engaged in criminal activity.

(Test. of Conrad, Hr'g Tr., Apr. 5, 2022, at 52-53).

Following Conrad's conversations with Cole and Jones, Conrad obtained consent from Jones to search the vehicle and initiated the search. (Dash Camera Video, Hr'g Ex. G-8, at 9:37-9:44; Test. of Conrad, Hr'g Tr., Apr. 5, 2022, at 52) (*see also*, Dash Camera Video, Hr'g Ex. G-8, at 11:26-11:37 (Conrad explaining to Jones that he did not have to consent to the search and confirming again with Jones that he had consented to search)). At that time, Conrad and Trooper Isbitski searched the vehicle and another Trooper stood between the guardrail, where Jones and Cole were standing/leaning, and the officers searching the car. (*See generally*, Dash Camera Video, Hr'g Ex. G-9, at 11:45-28:30).

Approximately 13 minutes into the search, Trooper Isbitski shook a speaker box that had been removed from the trunk of the vehicle, removed the single speaker from the packaging and shook it. (Dash Camera Video, Hr'g Ex. G-9, at 24:46; Test. of Conrad, Hr'g Tr., Apr. 5, 2022, at 54). When the Trooper shook the box/speaker, the Troopers "noticed an object rattling inside" which was suspicious to them and led them to want to further inspect the speaker in the trunk. (Test. of Conrad, Hr'g Tr., Apr. 5, 2022, at 55). The Troopers discussed that something was loose in the speaker box, that they needed a screwdriver, and agreed that something "shouldn't be bouncing around" in the speaker box. (Dash Camera Video, Hr'g Ex. G-9, at 24:46-28-21). As explained by Conrad:

> We noticed that the Phillips head screws that hold the speaker together, the housing of the speaker, those heads were tooled as if they had been off and on before. They don't come like that from the factory, like, they've been tampered with. So Trooper Isbitski retrieved the screwdriver that was already in the trunk of the vehicle, the Phillips screwdriver, he's using that screwdriver to back out the Phillips screws.

11

(Test. of Conrad, Hr'g Tr., Apr. 5, 2022, at 55).

As the officers began conducting the search of the speaker, Jones stated that he "gotta go" (Dash Camera Video, Hr'g Ex. G-9, at 28:21), which Conrad deemed to be a withdrawal of Jones' consent to search the vehicle (Test. of Conrad, Hr'g Tr., Apr. 5, 2022, at 55-56).

The Troopers on the scene decided not to bring a K-9 to run around the car and instead "made a decision to remove the car from the roadway now" and "felt, based upon the totality, that [they] had, at least probable cause to conduct a search of the vehicle, and, also, the fact that there was a safety concern by the way [Jones and Cole] were acting." (Test. of Conrad, Hr'g Tr., Apr. 5, 2022, at 56). According to Conrad,

> We felt that once, you know, they noticed we were focused on the speaker, they kept inching forward, they would not listen and stay back on the guard rail. That's why I closed the door, at one point, I could see Trooper Roman is concerned, he kept motioning to me that something is going on.
>
> So I didn't want this to turn into a fight or flight circumstance, so the decision was made to tow the car off the road, place them in custody, and proceed back to the Wilkes-Barre City Police Department.

(Test. of Conrad, Hr'g Tr., Apr. 5, 2022, at 56; *see also, id.* at 65-66).

The vehicle was thereafter impounded at the Wilkes-Barre Police Department. (Test. of Conrad, Hr'g Tr., Apr. 5, 2022, at 57). Conrad conducted an exterior search of the vehicle with his K-9 drug detector. (Test. of Conrad, Hr'g Tr., Apr. 5, 2022, at 57). Based on the K-9's positive indication while searching the area of the vehicle's trunk, a search

warrant was obtained.  (Test. of Conrad, Hr'g Tr., Apr. 5, 2022, at 57; Test. of Lamm, Hr'g

Tr., Apr. 5, 2022, at 19).  After the search warrant was obtained, controlled substances were

found concealed inside the speaker box that Conrad and Isbitski had been shaking prior to

Jones withdrawing his consent to the vehicle search.  (Test. of Conrad, Hr'g Tr., Apr. 5,

2022, at 57; see also, Test. of Lamm, Hr'g Tr., Apr. 5, 2022, at 19-20).  Lamm also obtained

two search warrants for an address in Wilkes-Barre, where controlled substances were later

recovered.  (Test. of Lamm, Hr'g Tr., Apr. 5, 2022, at 20-21).

### III. ANALYSIS

Preliminarily, the Court notes the shift in the parties' legal positions and arguments

following the evidentiary hearings.  In Defendant Jones' brief in support of his motion to

suppress, Defendant argued that "no reasonable suspicion existed to conduct a traffic stop

on Mr. Jones' vehicle".  (Doc. 27, at 6).  In response, the Government asserted that law

enforcement had reasonable suspicion to initiate the traffic stop based upon "the observed

traffic violation" and, in addition or in the alternative, based upon "proven reliable information

received from a confidential source."  (Doc. 33, at 8, 9).  Following the submission of the

parties' supporting and opposition briefs, the Court held a hearing on April 5, 2022.  At the

hearing, Trooper Lamm testified that, on March 14, 2021, "[b]ased on the totality of the

circumstances of my investigation and the circumstances, at that point . . . I would have

pulled [Jones] over without a traffic violation."  (Test. of Lamm, Hr'g Tr., Apr. 5, 2022, at 35).

Lamm explained:

I believe we had reasonable suspicion, at that point, to pull the vehicle over. We normally stop a vehicle for a traffic violation to, sort of, distance – you know, if there's a traffic violation there, we utilize that for the initial stop to try to distance the investigation and the confidential informant, but . . . that vehicle, I believe, I would have had the right to stop it.

(Test. of Lamm, Hr'g Tr., Apr. 5, 2022, at 35).   Corporal Conrad also testified that his "goal" on March 14, 2021, "was going to be to conduct a traffic stop of the vehicle" and he responded affirmatively when asked if his "mission was to stop the vehicle . . . when [he was] called in to work" on that day. (Test. of Conrad, Hr'g Tr., Apr. 5, 2022, at 58-59; *see also, id.* at 62-63).   The Government thereafter filed a Supplemental Post-Hearing Brief (Doc. 43) which, presumably in light of Trooper Lamm and Corporal Conrad's admissions, no longer addresses the argument that the police had reasonable suspicion to initiate the traffic stop based upon the observed traffic violation, and instead limits its argument to whether law enforcement had probable cause to search Jones' vehicle. (*See generally*, Doc. 43; *see also*, Doc. 53, at 22 (Defendant's post-hearing brief understanding the Government to have "conceded that the traffic stop in this case was initiated for the purposes of investigating the crime of drug trafficking and not because of a traffic violation.").   The Court thus largely limits its analysis herein to the issue of probable cause to search Jones' vehicle on March 14, 2021.[6]

---

[6] In light of Trooper Lamm and Corporal Conrad's testimony at the hearing that they were going to pull Jones over that day, regardless of any traffic violation and the Government's apparent abandonment of the argument that the purported traffic violation provided a basis for the traffic stop, Defendant concedes that any analysis of whether the traffic stop was impermissibly prolonged under *United States v. Rodriguez* is unnecessary. (*See* Doc. 53, at 13 n.8).

The Fourth Amendment provides that individuals shall not be subject to "unreasonable searches and seizures." U.S. CONST. amend. IV. "[A] defendant who challenges a search or seizure typically bears the burden of proving that it was illegal." *United States v. Headen*, 264 F.App'x 244, 246 (3d Cir. 2008). "However, once the defendant has established a basis for his motion, i.e., the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995).

"The United States Supreme Court has held that stopping a car and detaining its occupants is a seizure under the Fourth Amendment." *Johnson*, 63 F.3d at 245. "Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause." *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002). As such, warrantless searches are generally presumed to be unreasonable, subject to "a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). One such exception allows an officer to search a vehicle without a warrant provided he has "probable cause to believe that the vehicle contains evidence of a crime." *United States v. Donahue*, 764 F.3d 293, 299-300 (3d Cir. 2014). *See also*, *United States v. Thompson*, 545 F.App'x 167, 170 (3d Cir. 2013) ("The automobile exception permits police to search and seize a vehicle so long as they have probable cause to believe that the vehicle contains contraband or evidence of a crime")(citing *Pennsylvania v. Labron,* 518 U.S. 938, 940 (1996)). The government bears the burden of establishing the

15

applicability of the automobile exception by a preponderance of the evidence. *Donahue*, 764 F.3d at 300.

A determination of the existence of probable cause requires a "totality-of-the circumstances approach." *Illinois v. Gates*, 462 U.S. 213, 230 (1983). "[P]robable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules." *Id*. at 232. "To find probable cause to search, there needs to be a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Burton*, 288 F.3d 91, 103 (3d Cir. 2002) (quoting *Gates*, 462 U.S. at 238).

In the present case, the testimony set forth at the evidentiary hearings clearly demonstrates that any basis for a finding of probable cause to initiate the traffic stop of Jones' vehicle on March 14, 2021, is largely derived from the information Barton, as Lamm's CI, provided to Lamm.

An informant's "veracity" or "reliability" and his/her "basis of knowledge" are "relevant considerations in the totality-of-the-circumstances analysis that traditionally has guided probable cause determinations: a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." *Gates*, 462 U.S. at 233. *See Thompson*, 545 F.App'x at 170 ("When relying on a confidential informant to establish probable cause, the informant's veracity, reliability, and basis of knowledge are relevant considerations in the totality of the circumstances analysis")

16

(citing *Gates,* 462 U.S. at 233).

Here, the testimony of Lamm and Barton, both of which the Court finds to be credible,[7] establishes that the information provided by Barton to Lamm had sufficient indicia of reliability to support a finding of probable cause to initiate the traffic stop.

Preliminarily, Lamm had an established relationship with Barton as of February, 2021. At the time Barton first contacted Lamm about Jones in February of 2021, she had been his CI since 2019, had done "dozens of controlled purchases", "provided reliable information", and Trooper Lamm had "arrested and successfully prosecuted several defendants, based upon information and [Barton's] cooperation." (Test. of Lamm, Hr'g Tr., Apr. 5, 2022, at 23; *see also*, Test. of Barton, Hr'g Tr., May 20, 2022, at 25, 37).

The information Barton provided to Lamm about Jones and Vickers from February, 2021 to March, 2021, was consistently shown to be reliable and based on her personal knowledge.

_____

[7] The Court acknowledges that Lamm's testimony contained some inconsistencies, primarily with respect to Lamm's account of the controlled buy between Barton and Vickers on March 10, 2021. These inconsistencies do not affect a finding as to the basic sequence of events that occurred on that day, and Barton's testimony as to the events on March 10, 2021, which was consistent with Lamm's testimony in all important respects, bolsters Lamm's testimony as to the underlying facts of the controlled buy, including the fact that fentanyl was, in fact, purchased by Barton from Vickers on March 10, in Vickers' hotel room.

Despite Defendant's repeated attacks on the credibility and reliability of Barton, the Court finds that she also provided consistent and credible testimony. Barton was honest in admitting that she has struggled with heroin addiction for 10 years, that she had relapsed by February of 2021 when the events at issue began to take place, that she repeatedly bought drugs from both Jones and Vickers prior to reporting Jones' drug dealing to Lamm and admitted to driving Jones to Philadelphia to pick up drugs on one occasion. The evidence provided at the hearings further establishes that each tip Barton provided to Lamm was confirmed through subsequent investigation. Finally, and notably, there is no suggestion that Barton had any motive to lie about the events at issue, or her participation therein.

Barton testified that she met Vickers while Vickers was living at the Host Inn and that, when she had learned that Jones was Vickers' supplier, she contacted Lamm. (Test. of Barton, Hr'g Tr., May 20, 2022, at 28-30). This information about Vickers and Jones was verified by Lamm, who "went through databases trying to find out who Michael Jones is" and who found that Jones dealt with some people in the local hotels, including Vickers. (Test. of Lamm, Hr'g Tr., Apr. 5, 2022, at 8-9, 25). Barton further informed Lamm that Vickers was selling drugs from her hotel room, Room 165 of the Host Inn, which was confirmed through the controlled buy of fentanyl by Barton from Vickers on March 10, 2021. (*See* Test. of Barton, Hr'g Tr., May 20, 2022, at 30-31; Test. of Lamm, Hr'g Tr., Apr. 5, 2022, at 9, 11). Although the timing of Jones' visit to the Host Inn on March 10 is unclear, it is undisputed that Barton was correct in conveying information that Jones was, or would be, at the hotel that day. (*Compare* Test. of Barton, Hr'g Tr., May 20, 2022, at 31-32 (testifying that during the controlled buy, Vickers told her that Jones was "showing up" to bring more drugs and collect money), Test. of Lamm, Hr'g Tr., Apr. 5, 2022, at 29, 42-43 (testifying that his CI told him that Jones was coming to the hotel to deliver drugs to Vickers) *with* Test. of Lamm, Hr'g Tr., Apr. 5, 2022, at 12-13, 28 (testifying that law enforcement saw Jones pull up to the hotel on March 10 prior to the completion of the controlled buy and followed Jones after he left the hotel)).

Barton's information that on March 12, 2021 Jones was traveling to Philadelphia with Cole, Vickers' husband, in Jones' vehicle (Test. of Barton, Hr'g Tr., May 20, 2022, at 34;

18

Test. of Lamm, Hr'g Tr., Apr. 5, 2022, at 13) was also confirmed by Lamm through the use of surveillance units who were able to follow Jones' vehicle, with Jones and Cole inside, to the Pennsylvania Turnpike on that day (Test. of Lamm, Hr'g Tr., Apr. 5, 2022, at 14).

Trooper Lamm confirmed that, as of March 12, 2021, he believed that everything Barton, as his CI, had told him about Jones was truthful, and he was able to corroborate the information she had provided to him. (Test. of Lamm, Hr'g Tr., Apr. 5, 2022, at 14).

Barton's information on March 14, 2021, prior to the traffic stop, also proved reliable. Barton correctly informed Lamm that Jones and Cole were returning from Philadelphia that day, and police officers were able to confirm this information through the use of surveillance.

As a result of the repeated reliability of Barton's information about Jones, Vickers, and Cole, Lamm had probable cause to believe, based on Barton's intelligence, that Jones' vehicle had narcotics in the vehicle, most likely located in the trunk, on March 14 when the surveillance units saw his vehicle exiting the Pennsylvania Turnpike.

Defendant suggests that Barton's admission that she had relapsed on drugs in February of 2021 taints the reliability of her information and, further, that Lamm should have been aware of Barton's drug use and thus not relied on the information provided.[8]

---

[8] Trooper Lamm confirmed that although Barton was a drug user in the past, "when they had worked with me, they claimed to be clean at that time." (Test. of Lamm, Hr'g Tr., Apr. 5, 2022, at 24). Lamm admitted that he thought Barton was "actively using" sometime between 2019 and 2021, but never in his presence, and not in February of 2021. (Test. of Lamm, Hr'g Tr., May 20, 2022, at 6-7). Barton, however, admitted that she had relapsed in February of 2021 and was using the heroin that she purchased from Vickers. (Test. of Barton, Hr'g Tr., May 20, 2022, at 43). Barton did not remember whether she informed Lamm of this fact but stated that she "never had the direct conversation" with Lamm that she was a customer of Vickers. (Test. of Barton, Hr'g Tr., May 20, 2022, at 43, 46).

Defendant also suggests that the evidence provided by Barton about Jones was not corroborated by any other source and did not sufficiently connect Jones to Vickers or Barton. (Doc. 53, at 20, 23-25).

The record does not support these findings. Rather, in applying a totality-of-the circumstances approach, Barton's information contained sufficient indicia of reliability and offered a fair probability that contraband or evidence of a crime would be found in a particular place, i.e. Jones' vehicle on March 14, 2021, to support a finding of probable cause to initiate the traffic stop. Even if Barton's admitted drug use during February and March of 2021 could be said to potentially affect the reliability or veracity of her information, this never proved to be the case, as evidenced by Lamm's repeated verifications of her information. Additionally, the basis of Barton's knowledge is not in question. Both Lamm and Barton testified that the information Barton provided in February and March of 2021 was derived from Barton's repeated communications and interactions with Vickers, all of which was verified and found to be correct. Barton also testified that she had personally bought drugs from Jones on a number of occasions in 2020 and once drove Jones back from Philadelphia where he went to purchase drugs. It is further undisputed that Vickers was married to Clinton Cole, who was the individual law enforcement officers saw in Jones' vehicle with Jones on both March 12 and March 14, 2021. Barton's information, regardless of any drug use, thus had a strong indicia of reliability. *See e.g., Gates*, 462 U.S. at 233 (a deficiency in a CI's veracity/reliability or a CI's basis of knowledge "may be compensated

for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability.").

In addition, the record establishes that, at most, Lamm was aware that Barton had relapsed at least once from 2019 to 2021. There is no evidence that Lamm was specifically aware from February to March 2021 that his CI was using illegal controlled substances. Although any awareness by Lamm that Barton was using controlled substances may require Lamm to more closely consider the reliability of the information provided by Barton, here, as previously addressed, Barton's information consistently proved correct and reliable. Defendant repeatedly asserts that Barton's relapse during the relevant time period renders "suspect" both her credibility and the information she provided to Lamm (*see e.g.,* Doc. 53, at 19, 24), and avers that the information was therefore insufficient to establish probable cause for the traffic stop on March 14, 2021. However, the record reflects that, regardless of Barton's use of controlled substances, as of March 14, Lamm had regularly verified the information Barton provided to him about Jones, Cole, and Vickers and that information had repeatedly been confirmed to be accurate.

Even if probable cause did not exist at the time of the traffic stop, which the Court finds it did, Conrad had reasonable suspicion based on the CI's information to initiate the traffic stop which then developed into probable cause given the totality of the circumstances.[9]

---

[9] Although as previously stated, the Government appears to have abandoned the argument that

21

Conrad, a trooper with the Pennsylvania State Police for approximately 17 years,

testified that upon pulling over Jones' vehicle, Cole, the driver, exhibited a number of signs

---

law enforcement had reasonable suspicion to initiate the traffic stop based upon the observed traffic violation, the Court nonetheless notes that the traffic violation, even if used as a pretext by law enforcement to initiate the stop, did provide an alternate basis for a finding that reasonable suspicion existed at the time of the stop.

"A well-established exception to the Fourth Amendment's warrant requirement permits an officer to 'conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.'" *United States v. Lewis*, 672 F.3d 232, 237 (3d Cir. 2012) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123, (2000)). Accordingly, "[a] routine traffic stop is constitutional when it is supported by reasonable suspicion." *United States v. Gooch*, 915 F.Supp.2d 690, 702 (W.D. Pa. 2012); *see also*, *United States v. Delfin-Colina*, 464 F.3d 392, 397 (3d Cir. 2006) (holding that the "reasonable suspicion standard applies to routine traffic stops"). "Reasonable, articulable suspicion is a 'less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence.'" *Delfin-Colina*, 464 F.3d at 396 (quoting *Wardlow*, 528 U.S. at 123). "In forming a reasonable suspicion, officers may rely on their own experience and knowledge." *United States v. Jones*, 506 F.App'x 128, 131 (3d Cir. 2012). "When determining whether an officer possessed reasonable suspicion to conduct a traffic stop, [a court] must consider the totality of the circumstances." *Lewis*, 672 F.3d at 237. Further, "an officer need not be factually accurate in her belief that a traffic law had been violated but, instead, need only produce facts establishing that she reasonably believed that a violation had taken place. Consequently, a reasonable mistake of fact 'does not violate the Fourth Amendment.'" *Delfin-Colina*, 464 F.3d at 398 (quoting *United States v. Chanthasouxat*, 342 F.3d 1271, 1276 (11th Cir. 2003)); *see also*, *United States v. Fleetwood*, 235 F.App'x 892, 895 (3d Cir. 2007).

Here, Corporal Conrad had a reasonable suspicion to conduct the traffic stop. Lamm testified that he had seen Jones' vehicle tailgating and speeding, information that he relayed to Conrad. (Test. of Lamm, Hr'g Tr., Apr. 5, 2022, at 17, 34-35). Conrad testified that he personally saw the vehicle in question tailgating another vehicle. (Test. of Conrad, Hr'g Tr., April 5, 2022, at 48; *see also*, Dash Camera Video, Hr'g Ex. G-8, at 1:14-1:17 (Conrad informing Cole upon beginning to speak with him that he had been tailgating and needed to "watch [his] speed")). As the Third Circuit has summarized:

> In *Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), the Supreme Court established a bright-line rule that any technical violation of a traffic code legitimizes a stop, even if the stop is merely pretext for an investigation of some other crime. And once a car has been legally stopped, the police may "escalate" the encounter by visually inspecting the interior of the car, and checking credentials and asking questions of the occupants. *See United States v. Givan*, 320 F.3d 452, 458 (3d Cir.2003) ("After a traffic stop that was justified at its inception, an officer who develops a reasonable, articulable suspicion of criminal activity may expand the scope of an inquiry beyond the reason for the stop and detain the vehicle and its occupants for further investigation.").

*United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006). A pretextual traffic stop nonetheless "requires the officer to have observed a traffic violation prior to initiating the traffic stop." *United States v. Lewis*, 672 F.3d 232, 879 (3d Cir. 2012). In the present case, regardless of whether the traffic stop was pretextual, Lamm and Conrad both testified that they personally observed Jones' vehicle tailgating and speeding soon before the initiation of the traffic stop, testimony which the Court deems credible.

of being nervous, and Jones appeared both uncomfortable and nervous. (Test. of Conrad, Hr'g Tr., Apr. 5, 2022, at 49-50). When Conrad requested Cole's driver's license, Cole stated he had no license with him. (Dash Camera Video, Hr'g Ex. G-8, at 1:36-1:48). Conrad further testified that his conversation with Cole raised his suspicions that there was criminal activity due to a number of vague and inconsistent answers and irrelevant questions and comments by Cole, particularly in light of the information he had previously received about Jones and Cole from Vice. (*See* Test. of Conrad, Hr'g Tr., Apr. 5, 2022, at 51-52). Conrad's conversation with Jones furthered his belief that Jones and Cole were engaged in criminal activity for a number of reasons, including the inconsistencies between the stories provided by Cole and Jones, "the vague travel plans", and their reactions to Conrad's questions. (Test. of Conrad, Hr'g Tr., Apr. 5, 2022, at 52-53). In addition, Conrad testified that when Trooper Isbitski shook the box/speaker which was located in the trunk of the vehicle, the Troopers "noticed an object rattling inside" which was suspicious to them. (Test. of Conrad, Hr'g Tr., Apr. 5, 2022, at 55). The police dash cam video confirms that the Troopers discussed that something was loose in the speaker box and agreed that something "shouldn't be bouncing around" in the speaker box. (Dash Camera Video, Hr'g Ex. G-9, at 24:46-28-21). Conrad explained that "the Phillips head screws that hold the speaker together . . . were tooled as if they had been off and on before. They don't come like that from the factory, like, they've been tampered with." (Test. of Conrad, Hr'g Tr., Apr. 5, 2022, at 55). As the officers began conducting the search of the speaker and attempting

23

to open it, Jones withdrew his consent to the search of the vehicle. (Dash Camera Video, Hr'g Ex. G-9, at 28:21; Test. of Conrad, Hr'g Tr., Apr. 5, 2022, at 55-56). Conrad, noting that at that time "there was a safety concern by the way [Jones and Cole] were acting", had the vehicle impounded at the Wilkes-Barre City Police Department. (Test. of Conrad, Hr'g Tr., Apr. 5, 2022, at 56, 65-66). Looking to the totality of the circumstances, this sequence of events, coupled with Conrad's prior knowledge of the information from Lamm's CI that drugs were allegedly in the car (Test. of Conrad, Hr'g Tr., Apr. 5, 2022, at 46, 58), supports a finding that the facts available to Conrad following the initiation of the traffic stop not only were sufficient to establish reasonable suspicion that Jones and Cole were involved in drug trafficking, but that that probable cause existed to search the vehicle following the initial traffic stop.

For the foregoing reasons, and upon consideration of the testimony and exhibits presented at the evidentiary hearings and the parties' briefs, the Court finds that Defendant's motion to suppress is without merit.[10]

---

[10] Defendant argues for the first time in his "Amended Post-Hearing Brief" that the "officers lacked probable cause to arrest Mr. Jones" (Doc. 53, at 25). The Court declines to address this argument where it was not set forth in Defendant's Motion to Suppress or supporting brief (see Docs. 26, 27; see also, Doc. 36). Instead, Defendant's Motion, supporting brief, and reply brief, all only address the search and seizure of Defendant's vehicle. Defendant's attempt to introduce a new argument in his final brief is inappropriate. Further, the Court notes that Defendant's argument is set forth only in brief and cursory fashion and is unsupported by any legal or factual analysis.

## IV. CONCLUSION

For the reasons set forth herein, Defendant Jones' Motion to Suppress Physical

Evidence (Doc. 26) will be denied.  A separate Order follows.

Robert D. Mariani
United States District Judge