THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,      :
                                  :
      v.                         :   3:21-CR-126
                                  :   (JUDGE MARIANI)
MICHAEL JONES, JR.,           :
                                  :
              Defendant.     :

## MEMORANDUM OPINION

### I. INTRODUCTION AND PROCEDURAL HISTORY

On April 27, 2021, a federal grand jury indicted Defendant Michael Jones, Jr., in a

10-count Indictment, charging him as follows:

- Conspiracy to Distribute and Possess with Intent to Distribute Cocaine Base and Fentanyl in violation of 18 U.S.C. § 846 (Count 1);

- Possession with Intent to Distribute Cocaine Base in violation of 18 U.S.C. § 841(a)(1) (Counts 2, 4);

- Possession with Intent to Distribute Fentanyl in violation of 18 U.S.C. § 841(a)(1) (Counts 3, 5);

- Possession with Intent to Distribute Methamphetamine in violation of 18 U.S.C. § 841(a)(1) (Count 6);

- Possession of a Firearm in Furtherance of Drug Trafficking in violation of 18 U.S.C. § 924(c) (Count 7);

- Prohibited Person in Possession of a Firearm in violation of 18 U.S.C. § 922(g) (Count 8);

- Possession of a Stolen Firearm in violation of 18 U.S.C. § 922(j) (Count 9);

- Maintaining a Drug Involved Premises in violation of 21 U.S.C. § 856(a)(2) (Count 10).

(Doc. 1).[1]

Following Jones' Indictment, Defendant, through counsel, filed a number of pre-trial motions over the course of two years.

First, on October 4, 2021, Defendant filed a Motion to Suppress Physical Evidence (Doc. 26).  Defendant's motion arose out of the traffic stop of Jones' vehicle in Luzerne County by the Pennsylvania State Police on March 14, 2021.  Defendant argued that all evidence seized subsequent to the traffic stop, including drugs and related paraphernalia from the vehicle, and drugs, drug paraphernalia, and guns later seized from a residence in Wilkes-Barre, should be suppressed.  (*Id.*).  The Court held an evidentiary hearing on Defendant's suppression motion on April 5, 2022.  At the hearing, the Government presented the testimony of two law enforcement witnesses: Jeffrey Lamm and Mark Conrad.  At the request of Defendant, and with the Government's concurrence, the Court held a second evidentiary hearing to supplement the record on May 20, 2022.  At the second hearing, the Government presented further testimony by Jeffrey Lamm as well as testimony from Amanda Barton.  Defendant did not present witness testimony at either hearing.  The parties thereafter filed post-hearing briefs. (*See* Docs. 43, 53, 55).  This Court denied Defendant's motion on July 22, 2022, and scheduled the case for trial. (*See* Docs.

---

[1] Counts 1, 2, and 4 of the Indictment were amended on June 15, 2022, to reflect that the cocaine seized from Jones' vehicle and residence was cocaine, not cocaine base. (*See* Doc. 21).

58-60).

However, following the appointment of new counsel for Defendant, the Court permitted Defendant to file additional pre-trial motions. (Doc. 96; *see also*, Docs. 72, 73). Defendant thereafter filed the following four pre-trial motions:

- Motion to Suppress Evidence – Warrantless Searches & Seizures (Doc. 97);
- Motion to Suppress Evidence – Arrested Without Probable Cause (Doc. 99);
- Motion to Suppress Evidence – Insufficient Nexus (Doc. 101);
- Motion to Suppress Evidence – Search Warrant Overbroad (Doc. 103).

On February 28, 2023, this Court denied Defendant's Motions to Suppress Evidence on the basis of Insufficient Nexus (Doc. 101) and Search Warrant Overbroad (Doc. 103). (Docs. 111, 112).

On February 23, 2024, following a number of continuances at the request of the parties, the Court held an evidentiary hearing on Defendant's Motion to Suppress Evidence on the basis of Warrantless Searches & Seizures (Doc. 97). The parties thereafter submitted post-hearing briefing (Docs. 160, 163). The motion is now ripe for the Court's review. For the reasons that follow, Defendant's Motion (Doc. 97) will be denied.

## II. SYNOPSIS

This Court previously set forth the factual history of this case as developed by the testimony of Jeffrey Lamm, Mark Conrad, and Amanda Barton at the evidentiary hearing and supplemental hearing, held on April 5, 2022, and May 20, 2022, in its Memorandum

3

Opinion addressing Defendant's prior Motion to Suppress filed on October 4, 2021. (*See* Doc. 58 at 3-13).  In brief, Jones was charged with crimes relating to the possession of drugs and weapons following a law enforcement investigation that relied on a confidential informant. (*Id.*) The investigation into Defendant culminated into the stopping and search of Jones' vehicle on his way back from a trip to Philadelphia and a subsequent search of Jones' residence at 325 High Street.  The Court incorporates herein its prior recitation of the facts but also sets forth the facts relevant to Defendant's current pending motion (Doc. 97) in more detail below.

On March 12, 2021, a confidential informant ("C.I.") notified Trooper Jeffrey Lamm that Michael Jones Jr. and Clinton Cole would be driving a vehicle to Philadelphia that day to pick up narcotics. (Test. of Lamm, Hr'g Tr., Apr. 5, 2022, Doc. 42, at 13:18-22.) On the same day, surveillance teams observed Jones and Cole depart their residence in Wilkes-Barre and head toward Philadelphia. (*Id.* at 14.)

On March 14, 2021, the C.I. informed Lamm that Cole and Jones would be leaving Philadelphia and returning to Wilkes-Barre soon with narcotics likely in the back trunk of the vehicle. (*Id.* at 15.) Following the receipt of this information, surveillance teams were set up upon several roadway locations that would be used to travel from Philadelphia to the Wilkes-Barre area. (*Id.*)

Later in the day on March 14, 2021, Lamm observed Jones' black Nissan Altima exit the Pennsylvania Turnpike at the Bear Creek Exit and travel northbound on State Route 115

at a fast rate of speed. (*Id.* at 15:19-25 and 16:15-17:8.) Lamm began following the vehicle

and observed that the Nissan was following closely behind another vehicle at less than one

car length distance. (Test. of Lamm, Hr'g Tr., Apr. 5, 2022, at 17:2-8.) Lamm radioed

Corporal Mark Conrad that the suspect vehicle was heading towards him and following a

car at a very close distance. (*Id*. at 17:9-18:8.) Prior to the surveillance detail, Conrad was

informed that "there was going to be a vehicle traveling back from Philadelphia, that they

had information from a confidential informant that this individual is going to be supplying or

bringing back from Philadelphia a quantity of controlled substances." (*Id*. at 46:11-19.)

 After Lamm notified Conrad that the target vehicle was observed getting off the

Turnpike, Conrad saw a dark red SUV and the Nissan directly behind the SUV pass his

location. (*Id*. at 48:10-13.) Conrad pulled out from his location onto SR 115 to pursue the

Nissan and caught up to it as the Nissan was pulling off of SR309/Cross Valley onto Exit 1.

(*Id.* at 48:15-25.)

Conrad initiated the traffic stop of the Nissan on the exit ramp. (Test. of Conrad, Hr'g

Tr., Apr. 5, 2022, at 48:25-49:1.) As Conrad approached the vehicle, he noticed that Cole,

the driver, was facing forward but the passenger, Jones, immediately turned around and

watched him approach the Nissan. (*Id*. at 49:5-13.) When Conrad approached Cole and

Jones in the vehicle, he noticed a strong odor of air fresheners. (*Id*. at 49:18-19). During the

brief initial contact, Cole appeared nervous, was very talkative, and was laughing when

nothing humorous was said. (*Id.* at 49:23-25.) Conrad also noticed that the passenger,

Jones, appeared to be nervous. (*Id.* at 50:1-2.)

Conrad separately interviewed Cole and Jones. (Test. of Conrad, Hr'g Tr., Apr. 5, 2022, at 52:23-53:3.) "Based upon their reaction, conflicting stories, the vague travel plans, the totality of the information they were providing," Conrad believed they were engaged in criminal activity. (*Id.* at 53:19-22). Jones granted Conrad consent to search the vehicle. Shortly after Trooper Christopher Isbitski began focusing on a speaker box that was removed from the trunk, Jones withdrew his consent. (*Id.* at 54:4-22 and 55.) Conrad then made the decision to tow the car off the road and place Cole and Jones into custody. (*Id.* at 56:20-23.) The vehicle was placed in impound at the Wilkes-Barre City Police Department and Conrad conducted an exterior search of the vehicle with his K-9 drug detector, who gave a positive indication towards the vehicle's trunk area. (*Id.* at 57:4-9.) On that same date, at 9:30 p.m., Magisterial District Judge Brian Tupper issued a search warrant for Jones' vehicle. (Gov't Ex. A., Doc. 115-1.) Officers subsequently discovered controlled substances in the speaker box, which was inside the trunk of the vehicle that was impounded at the Wilkes-Barre City Police Department. (Test. of Conrad, Hr'g Tr., Apr. 5, 2022, at 57:14-23.)

On March 15, 2021, at 5:20 p.m. Magisterial District Judge Richard Cronauer issued a search warrant for 325 High Street, Wilkes-Barre, PA for U.S. currency. (Gov't Ex. B, Doc. 115-2.) Once at the residence for U.S. currency, officers observed a significant amount of suspected illegal controlled substances and a gun. (Test. of Ference, Hr'g Tr., Feb. 23,

2024, at 50-51.) Officers then sought and received at 7:11 p.m. a second search warrant from Judge Cronauer for the premises to seize the controlled substances and firearm. (Gov't Ex. C, Doc. 115-3.)

### III. ANALYSIS

In his Motion to Suppress Evidence on the basis of Warrantless Searches & Seizures (Doc. 97), Jones argues that (1) law enforcement unconstitutionally searched his vehicle prior to the issuance of a search warrant; and (2) law enforcement unconstitutionally seized drug and firearm evidence prior to the issuance of a search warrant authorizing the seizure of those items from the 325 High Street residence. (*See* Doc. 97 ¶¶ 5, 9, 10.) The Court will address each of these arguments in turn.

### A. Search of Vehicle

Defendant first contends that "the warrantless search of his vehicle was per se unreasonable and that no valid exception to the warrant requirement exists in this case." (Doc. 97 ¶ 5.) Jones argues that, while "[t]he warrant to search the Nissan Maxima was issued by Magisterial District Judge Brian Tupper at 9:30 PM on March 14, 2021 [,] [...] law enforcement searched his vehicle prior to the issuance of the sought after warrant" at 8:11 p.m. (Doc. 97 ¶¶ 3, 4, 5.) In turn, the Government asserts that a warrant to search the vehicle was not required under the "automobile exception" to the warrant requirement, and that even if the automobile exception did not apply, no non-consensual search of the car was conducted prior to the issuance of the 9:30 p.m. warrant. (*See, e.g.*, Doc. 115 at 13-

16.) For the reasons explained below, the Court agrees with the Government.

The Fourth Amendment provides that individuals shall not be subject to "unreasonable searches and seizures." U.S. CONST. amend. IV. "[A] defendant who challenges a search or seizure typically bears the burden of proving that it was illegal." *United States v. Headen*, 264 F.App'x 244, 246 (3d Cir. 2008). "However, once the defendant has established a basis for his motion, i.e., the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995).

"The United States Supreme Court has held that stopping a car and detaining its occupants is a seizure under the Fourth Amendment." *Johnson*, 63 F.3d at 245. "Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause." *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002). As such, warrantless searches are generally presumed to be unreasonable, subject to "a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). One such exception allows an officer to search a vehicle without a warrant provided he has "probable cause to believe that the vehicle contains evidence of a crime." *United States v. Donahue*, 764 F.3d 293, 299-300 (3d Cir. 2014). *See also*, *United States v. Thompson*, 545 F.App'x 167, 170 (3d Cir. 2013) ("The automobile exception permits police to search and seize a vehicle so long as they have probable cause to believe that the vehicle contains contraband or evidence of a crime")(citing *Pennsylvania v. Labron,*

518 U.S. 938, 940 (1996)). The Government bears the burden of establishing the

applicability of the automobile exception by a preponderance of the evidence. *Donahue*, 764

F.3d at 300.

A determination of the existence of probable cause requires a "totality-of-the

circumstances approach." *Illinois v. Gates*, 462 U.S. 213, 230 (1983). "[P]robable cause is a

fluid concept – turning on the assessment of probabilities in particular factual contexts – not

readily, or even usefully, reduced to a neat set of legal rules." *Id*. at 232. "To find probable

cause to search, there needs to be a 'fair probability that contraband or evidence of a crime

will be found in a particular place.'" *United States v. Burton*, 288 F.3d 91, 103 (3d Cir. 2002)

(quoting *Gates*, 462 U.S. at 238).

Here, Jones argues that the Government improperly searched and seized evidence

from his vehicle at 8:11 p.m., prior to the issuance of the 9:30 p.m. search warrant. (Doc. 97

¶ 4.) In doing so, Jones relies on "a photo of an evidence bag on which law enforcement

officers noted that the evidence therein was recovered at 2011 Hrs. (8:11 PM)." (*Id*.)

However, the Government correctly responds that it:

> presented credible evidence at the suppression hearing that the search of
> Jones's vehicle in the police department parking garage did not occur until after
> a search warrant was obtained. Although one evidence bag from the vehicle
> search, Government's Exhibit 1, indicates a time prior to the signing of the
> search warrant, testimony clearly explained what happened. Officer Sheridan,
> who did not participate in the search of Jones's vehicle, wrote the time of "20:11
> hours" on the evidence bag because that was the time Officer Oliver called the
> 911 center to obtain the call for service number. H.T., pgs. 80-81. It was not
> the actual time the item was recovered from the vehicle.

(Doc. 115 at 15.)

At the Court's February 23, 2024, evidentiary hearing on Defendant's Motion (Doc.

97), law enforcement personnel testified as to how the time written on the evidence bag was

not indicative of when the evidence was recovered from the vehicle. (*See generally* Hr'g Tr.,

Feb. 23, 2024, Doc. 159.) Specifically, Officer Jeffrey Ference testified that the time on the

evidence bag does not reflect the time that the evidence from the trunk of the car was

recovered:

> Q. So it's your testimony that the first package of the three that Attorney Roberts went through is from the Wilkes-Barre Police, is that right?
>
> A. Yes.
>
> Q. And Exhibit D indicates that the contents includes one item, 13 50 milliliter bottles of Xylazine, right?
>
> A. Correct.
>
> Q. And the date and time of recovery is 3/14 of 2021 at 20:11 hours, right?
>
> A. Yes.
>
> Q. So you will agree with me that 20:11 hours is 8:11 p.m., is that right?
>
> A. Yes.
>
> Q. And the search warrant for the car was issued on March 14, 2021, at 9:30?
>
> A. Correct.
>
> Q. So is it fair to assume that this evidence of this Xylazine that was recovered from the car was recovered prior to the issuance of that search warrant?
>
> A. No, it is not.

Q. Okay. Can you explain that?

A. The number in reference on the date and time there was put on there as the time of the initial incident that the incident was created.

Q. What incident?

A. The incident of the investigation of the stop.

Q. Okay. But the affidavit of probable cause that's attached to the petition of search warrant of the car indicates that the time on the trooper's watch is 16:30, which is when these Defendants are supposedly leaving Philadelphia, Pennsylvania. So isn't that the start of the investigation?

A. Unfortunately, different agencies and police departments aren't dispatched by the same persons. So there would be different times from different -- from different agencies. We don't go off Pennsylvania State Police's dispatch. We don't go through them. We go through our own dispatcher.

Q. According to Defendant's Exhibit D, date and time of recovery, that means recovery of the evidence is 8:11.

A. It was a time, as I said, put on there as the initial time of the call when it was created through Wilkes-Barre.

. . . .

Q. All right. So you're not concerned with the fact that the date and time of recovery on 3/14/2021 appears on this document as 8:11, along with the notation of a recovery by attorney (sic) Oliver's badge number who previously testified that he had nothing do with the search?

A. No. Because I know the items were not recovered at that time. They were recovered after the search warrant was signed.

(Test. of Ference, Hr'g Tr., Feb. 23, 2024, Doc. 159, at 60-62.)

Additionally, Officer James Sheridan testified that he would have assumed the 8:11

11

p.m. time on the evidence bag reflected the time that the Call for Service ("CFS") report was

generated rather than the seizure of the evidence from the car:

> Q. Sir, I'm saying that as far as a reading of this bag is concerned, it's fair to assume that recovery means recovery of the drug at 8:11?
>
> A. Well, I wouldn't assume that, sir.
>
> Q. Well, what would your assumption be?
>
> A. My assumption wouldn't be. My assumption is based on the fact that I know that the number that came from here came from the date and time of the CFS report that was generated based on the creation of an incident for an investigation.
>
> Q. That was inputted in the computer after the date of recovery?
>
> A. No, sir.
>
> Q. Okay.
>
> A. The CFS report is generated from the Luzerne County Comm Center when the incident for the investigation is created.

(Test. of Sheridan, Hr'g Tr., Feb. 23, 2024, Doc. 159, at 89:23-90:12.)

Finally, Detective James Conmy testified that the 8:11 p.m. time indicated on

the offense starting date was the time when law enforcement requested that 911 open

the IRC number:

> Q. And then looking at Page 3 of 33 on Exhibit 22, offense starting date, do you see that in the middle of the page, 3/14/21 8:11 p.m.? We know from the affidavit of probable cause that is not when the investigation started.
>
> A. No. I believe that was the time when we requested that 911 open the IRC number.

Q. The dispatch date?

A. Right. We have to call and request the number, so we need an investigation number.

(Test. of Conmy, Hr'g Tr., Feb. 23, 2024, Doc. 159, at 110:1-9.)

As outlined herein, there is ample credible testimonial evidence that the 8:11 p.m. time indicated on the evidence bag was not intended to state the time in which the evidence was seized from Jones' vehicle, but instead was an indication of the time that law enforcement created a CFS report based on the creation of an incident for investigation. The testimony of three law enforcement officials during the Court's February 23, 2024, evidentiary hearing consistently supports this determination. (*See, e.g.*, Hr'g Tr., Feb. 23, 2024, Doc. 159, at 60-62, 89-90, 110.)

Even if the Court were to assume that the evidence was seized from Jones' vehicle at 8:11 p.m., prior to the issuance of the 9:30 p.m. warrant, which the Court does not, the Court has previously determined that there was probable cause to search Jones' car and its trunk for drugs at the time Jones was stopped by law enforcement. Specifically, in the Court's July 22, 2022, Memorandum Opinion, the Court held that:

> [a]s a result of the repeated reliability of Barton's information about Jones, Vickers, and Cole, Lamm had probable cause to believe, based on Barton's intelligence, that Jones' vehicle had narcotics in the vehicle, most likely located in the trunk, on March 14 when the surveillance units saw his vehicle exiting the Pennsylvania Turnpike.

(Doc. 58 at 19.)

This Court then explained that Conrad, who had initiated the stop and search of

13

Jones' vehicle, at a minimum "had reasonable suspicion based on the CI 's information to initiate the traffic stop which then developed into probable cause given the totality of the circumstances." (*Id*. at 21.)

Despite this prior finding, Defendant argues that no valid exception to the warrant requirement applies to the alleged 8:11 p.m. search and seizure of evidence from Jones' vehicle. The Court disagrees. As explained, *supra*, "[t]he automobile exception permits police to search and seize a vehicle so long as they have probable cause to believe that the vehicle contains contraband or evidence of a crime." *Thompson*, 545 F.App'x at 170. That is precisely what occurred in this instance. (*See* Doc. 58 at 19-21.)

Because the evidence obtained from Defendant's Nissan Maxima was either properly obtained through a warrant or through the "automobile exception" to the warrant requirement, that evidence will not be suppressed.

## B. Seizure of Drugs and Weapon Evidence in Home

Jones also contends that evidence of narcotics and weapons were improperly seized from the 325 High Street residence prior to there being a search warrant authorizing the seizure of that evidence. Specifically, Jones argues that:

> 6. [...] on March 15, 2021, Wilkes-Barre Police Officer Jeffrey Ferance and Pennsylvania State Police Trooper Jeffrey Lamm applied for a Search Warrant to search for US Currency at a residence at 325 High Street, Wilkes-Barre, Pa, 18702. In the Probable Cause Affidavit in support of the warrant the agents expressly relied upon evidence recovered from the warrantless search of the Nissan Maxima. A copy of the Search Warrant and related documents are attached hereto as Exhibit C.

14

7. Based upon the above-referenced Affidavit of Probable Cause, on March 15, 2021, at 5:20 PM, Magisterial District Judge Richard J. Cronauer issued the sought after warrant

. . . .

9. On March 15, 2021, after police had entered the residence at 325 High Street, Wilkes-Barre, a second Search Warrant was sought to seize controlled substances, paraphernalia, a firearm, magazine, and ammunition. The Search Warrant was issued on March 15, 2021, at **7:11 PM**. Attached hereto as Exhibit J is a copy of the Search Warrant.

10. Jones submits that the alleged drug evidence and firearm, magazine, and ammunition were seized prior to the issuance of the Search Warrant at **7:11 PM** on March 15, 2021. Attached hereto as Exhibits D through I are photographs of evidence bags on which law enforcement agents noted that the evidence was recovered from the residence between 1830-1845 Hrs. (**6:30-6:45 PM**)

11. Jones submits that because the evidence was seized from the 325 High Street residence before the Search Warrant authorizing the seizure of the evidence the evidence should be suppressed. <u>United States v. Williams</u>, 413 F.3d 347 (3rd Cir. 2005).

(Doc. 97 ¶¶ 9-11.)

In response, the Government asserts that "[c]learly while searching the residence for U.S. currency, law enforcement observed additional evidence in plain view" and that "[a]lthough they sought and obtained a second warrant [for drugs and other evidence], it was unnecessary." (Doc. 115 at 14.)

The "plain view" exception is one exception to the general warrant requirement. "There are three requirements for valid seizures of evidence in plain view. 'First, the officer must not have violated the Fourth Amendment in arriving at the place from which the

evidence could be plainly viewed.' Second, the incriminating character of the evidence must

be 'immediately apparent.' Third, the officer must have 'a lawful right of access to the object

itself.'" *United States v. Stabile*, 633 F.3d 219, 241 (3d Cir. 2011) (quoting *United States v.*

*Menon*, 24 F.3d 550, 559-60 (3d Cir. 1994) (internal quotation omitted).

Here, this Court previously determined that the warrant issued at 5:20 p.m.

authorizing a search for U.S. currency at the 325 High Street residence contained sufficient

probable cause. (*See* Doc. 111.) Specifically, the Court found that:

> [h]ere, to uphold Magisterial District Judge Cronauer's determination of
> probable cause, the Court must determine whether he had a substantial basis
> to conclude that U.S. Currency, obtained through the illegal sales of narcotics,
> would be found at the 325 High Street residence. The Court finds that in issuing
> the search warrant for 325 High Street, Magisterial District Judge Cronauer had
> a sufficient basis to conclude probable cause so existed.

(*Id.* at 8.)

The law enforcement officers who searched Jones' closet, safe, and other areas

within the 325 High Street residence were acting pursuant to the warrant that was issued at

5:20 p.m. authorizing them to search the residence for U.S. currency (Doc. 115-2.)  Jones

does not specifically dispute in his briefing that U.S. currency could reasonably be found in

all of the areas of the residence in which law enforcement personnel searched, including

closets, safes, and shoe boxes. (*See generally* Docs. 98, 163.) Additionally, Jones does not

dispute that the incriminating character of the drugs and weapons found in the residence

was immediately apparent to the law enforcement personnel conducting the search. (*See*

*generally, id.*) Indeed, the Affidavit of Probable Cause, signed by Officers Ference and

Lamm, to secure the 7:11 p.m. warrant, stated that:

> [u]pon entering the back bedroom, Officers checked the closet and observed in plain view a Gardell brand safe. On top of the safe were numerous packaging materials and a bag containing a white powdery substance as well as a plate with a white powdery residue. Officers were able to gain entry into the safe and located an amount of U.S. currency, a BB gun, and multiple bags containing suspected Heroin/Fentanyl. Also in the back bedroom, Officer located a Bluetooth portable party speaker and discovered a Taurus 9mm handgun and a loaded magazine concealed in the speaker.

> While continuing to search the back bedroom, Officers located a shoe box on a shelf containing more packaging material used to package/repackage a controlled substance as well as numerous glassine baggies containing suspected Heroin/Fentanyl. On top of a dresser, Officers observed a pill bottle that was labeled "Michael Jones" as well as a digital scale.

(Gov't Ex. C, Doc. 115-3.)

Each location mentioned in the Affidavit of Probable Cause is an expected location for law enforcement officers to search for U.S. currency. Despite Jones' argument to the contrary (Doc. 163 at 11), it is of no moment that Detective Ference continued to search Defendant's residence after *some* U.S. currency was already found. The search warrant issued at 5:20 p.m. authorized law enforcement to search the 325 High Street residence for U.S. currency in any location where it may be found. (*See* Doc. 115-2.) In his post-hearing Brief, Jones relies on a quote from Detective Ference stating that "[w]e started finding narcotics in the house soon after we located the money in the house" to contend that any further search of the house was unlawful. (*See* Doc. 163 at 11.) Jones' reliance on this quote from Ference is misplaced. In that same line of questioning, Detective Ference testified that law enforcement was looking for U.S. currency throughout the search, and only

17

discovered other items in the search for the currency:

> Q. So it's fair to say that you had recovered all of these drugs at 5:45 p.m.?
>
> A. We started finding narcotics in the house very soon after we located the money in the house.
>
> Q. My question is that it notes here in the receipt that you seized the property at 5:45 and this property includes 44 items most of which, if not all, are drugs?
>
> A. None of the narcotics items, firearm, or the money were taken out of the house until we received the second search warrant.
>
> Q. Yeah. But you seized it, didn't you? You made an inventory of it. You examined it, you found it, this is here. It's clearly in the receipt, right?
>
> A. We cannot stop. We were searching for U.S. currency. We located the other items in our search for U.S. currency. That is specifically the time that around the items were located in the house. We didn't seize anything until we obtained the secondary search warrant.

(Test. of Ference, Hr'g Tr., Feb. 23, 2024, Doc. 159, at 66:11-67:3.) (*See also*, *id*. at 67:18-

19 (Ference denying Defense counsel's assertion that he obtained the second search

warrant "because [he] took all the drugs and [he] had to fix it" and testifying that "we didn't

have to fix anything.  We can't not find things as we are searching for money in the

house")); *id*. at 76:14-77:6 (Ference testifying that he was in the closet and going through

boxes, including where a firearm was found, after the first search warrant was issued

because they were "[l]ooking for money.")).

     Additionally, even if the Court were to assume, *arguendo*, that the drugs and

weapons found at the 325 High Street residence were not appropriately seized under the

"plain view" exception to the search warrant requirement, the Court would nonetheless find

that the evidence recovered at the residence falls within the "inevitable discovery" exception to the search warrant requirement.

The Supreme Court explained the inevitable discovery exception to the exclusionary rule in *Nix v. Williams*: "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means ... then the deterrence rationale has so little basis that the evidence should be received." 467 U.S. 431, 444 (1984). As noted by the Third Circuit in *United States v. Vasquez De Reyes*, "[t]he rule so applied permits the court to balance the public interest in providing a jury with all relevant and probative evidence in a criminal proceeding against society's interest in deterring unlawful police conduct." 149 F.3d 192, 195 (3d Cir. 1998) (citing *Nix*, 467 U.S. at 443). The underlying rationale for the inevitable discovery rule is that "the exclusionary rule ensures that the police should not be in a better position as a result of their illegal action, but neither should they lie in a worse position." *Vasquez De Reyes*, 149 F.3d at 194-95; *see also United States v. Stabile*, 633 F.3d 219, 245 (3d Cir. 2011) (citing *Vasquez De Reyes*, 149 F.3d at 195). The Government's burden can be met if the government establishes that the police, following routine procedures, would inevitably have uncovered the evidence. *See, e.g., United States v. Martinez–Gallegos*, 807 F.2d 868, 870 (9th Cir. 1987).  Furthermore,

> Proof of inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment and does not require a departure from the usual burden of proof at suppression hearings. The exception requires the district court to determine, viewing affairs

> as they existed at the instant before the unlawful search, what would have
> happened had the unlawful search never occurred. [*United States v. Kennedy*,
> 61 F.3d 494, 498 (6th Cir. 1995)].

*Vasquez De Reyes*, 149 F.3d at 195.  The Third Circuit Court has agreed with the Seventh

Circuit which stated in *United States v. Jones*, 72 F.3d 1324 (7th Cir. 1995) that

"[s]peculation and assumption do not satisfy the dictates of *Nix* .... Inevitable discovery is

not an exception to be invoked casually, and if it is to be prevented from swallowing the

Fourth Amendment and the exclusionary rule, courts must take care to hold the government

to its burden of proof," *id.* at 1334 (citations omitted); *Vasquez De Reyes*, 149 F.3d at 196.

Here, the parties do not dispute that a search warrant for drugs and weapons in the

325 High Street residence was issued at 7:11 p.m. on March 15, 2021. (*See* Doc. 115-3.)

This warrant was issued less than two hours after the issuance of the earlier warrant

authorizing law enforcement personnel to search the residence for U.S. currency. (See Doc.

115-2.) In Jones' motion, he notes that "the alleged drug evidence and firearm, magazine,

and ammunition were seized prior to the issuance of the Search Warrant at 7:11 PM"

because "law enforcement agents noted that the evidence was recovered from the

residence between 1830-1845 Hrs. (6:30-6:45 PM)." (Doc. 97 ¶ 10.)  Even if the Court were

to assume the truth of this assertion, the recovery of the at-issue evidence took place less

than forty-five minutes prior to the issuance of the 7:11 p.m. search warrant.  It would be

anomalous for the Court to conclude that this evidence would not have been imminently

discovered by law enforcement officers had they waited to search the residence until 7:11

p.m. *See Stabile*, 633 F.3d at 243.

Even if the Court were to assume that the seizure of the evidence of drugs and weapons was inappropriate under the plain view exception, the evidence inevitably would have been discovered by lawful means mere minutes after the time Jones alleges it to have been discovered. The consistent and reliable information obtained through the Confidential Informant, as well as the conduct of Jones at the time of the initial roadside search of the vehicle, produced sufficient probable cause for a magistrate judge to issue a warrant to search Jones' residence for evidence of drugs. *See United States v. Stabile*, 633 F.3d 219, 245 (3d Cir. 2011) ("The inevitable discovery analysis focuses on 'historical facts capable of ready verification, not speculation.'") Therefore, even if the plain view exception did not account for the discovery of evidence of drugs and weapons in the residence, the inevitable discovery exception would apply in this instance in light of the evidence already existing prior to the initial search of the home.

Because the Government's search of Jones' vehicle and the 325 High Street residence fell within the scope of a previously authorized warrant or was otherwise appropriate under an exception to the general warrant requirement, Jones' motion is without merit.

## IV. CONCLUSION

For the reasons set forth herein, Defendant Jones' Motion to Suppress Evidence on the basis of Warrantless Searches & Seizures (Doc. 97) will be denied. A separate Order follows.

Robert D. Mariani
United States District Judge